## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| **SHREE VEER CORPORATION and CHIEF HOSPITALITY, LLC, ON BEHALF OF THEMSELVES AND ALL OTHERS SIMILARLY SITUATED,** | § § § § § | |
| *Plaintiffs,* | § | **CIVIL ACTION NO. 3:20-cv-03268-l** |
| | § | |
| **v.** | § | |
| | § | |
| **OYO HOTELS, INC.,** | § | |
| *Defendants.* | § | |

### PLAINTIFFS' SECOND AMENDED COMPLAINT AND CLASS ACTION

TO THE HONORABLE JUDGE OF SAID COURT:

Now Come SHREE VEER CORPORATION and CHIEF HOSPITALITY, LLC,

Plaintiffs ("Plaintiffs"), and file this *Second Amended Complaint and Class Action* against OYO

Hotels, Inc. ("Defendant" or "OYO"), on behalf of itself and on behalf of a class of similarly

situated parties, and alleges as follows:

### I.
### AUTHORITY TO FILE AMENDED PLEADING

1.      Plaintiffs timely file this *Second Amended Complaint and Class Action* pursuant

to the Court's September 30, 2021 *Memorandum Opinion and Order* (ECF Doc. 20).

### II.
### PARTIES

2.      Plaintiff Shree Veer Corporation is a corporation formed under the laws of the State

of Oklahoma.

3.      Plaintiff Chief Hospitality, LLC is a limited liability company formed under the

laws of the State of Nebraska.

4.      Defendant OYO Hotels, Inc. ("OYO") is a foreign for-profit corporation formed under the laws of Delaware with its principal office in Dallas, Texas. OYO may be served with process through its counsel of record, Megan Martin Powers, at 600 E. John Carpenter Freeway, Suite 234, Irving, Texas 75062.

### III.
### STATEMENT OF FACTS

5.      Upon information and believe, Plaintiffs assert the following Statement of Facts which, in addition to other facts, supports Plaintiffs' causes of actions set out herein.

6.      Defendant OYO is one of the largest and fastest-growing hospitality chains of leased and franchised hotels in the world.

7.      In 2019, OYO began its expansion into the United States market. OYO's strategy included rapidly inducing as many small, independent hotel properties to sign a franchise agreement with OYO as possible.

8.      Successfully inducing small, independent-minded hotel property owners to re-open as an *OYO-franchised* hotel, when OYO is basically an *unknown brand* in the United States was a Herculean task that had to be accomplished rapidly.

9.      In fact, as stated by the Wall Street Journal:

> The six-year-old budget hotel company already ranks among the world's largest hotel chains. Oyo has more than 1 million hotel rooms and 23,000 hotels world-wide through franchising and other partnerships. It has raised about $1.5 billion from SoftBank Group Corp. and others."
>
> The 25-year-old founder and chief executive, Ritesh Agarwal, is pursuing a global expansion, and the U.S. market is a crucial part of that effort. In June, Oyo announced it was investing $300 million to boost the number of hotels in the U.S. At the time of the announcement, the company had 50 U.S. hotels. Today, it has 112 hotels and expects to have nearly 150 hotels by the end of this month.

"We've been opening one building per day across the United States," said Mr. Agarwal. "That is just a starting point, and one hotel per day will look like a very small number."

…

**Oyo lacks the brand recognition of such budget competitors as Days Inn, Motel 6 and Econo Lodge, and it has less experience in the market.** But Mr. Agarwal built the Oyo chain, officially known as Oravel Stays Pvt. Ltd., **by wooing independently owned small and midsize hotels with a number of perks and innovations not regularly offered in the industry.**

https://www.wsj.com/articles/indias-oyo-rolls-dice-with-purchase-of-las-vegas-hooters-hotel-11566552601 (last visited December 8, 2020; attached as Exhibit 4).

10.     Because OYO had to induce long-standing property owners that had operated under well-known franchised brands such as Motel 6 to switch to becoming an OYO-branded hotel, OYO felt the need to guarantee perks that no other established, mature hotel franchisor in the United States would match.

11.     On or about June/July 2019, OYO representatives invited Plaintiff's Managing Member, Dr. Chandrakant Shah, and 50-70 other small or independent property owners to a meeting with Defendant's Chief Executive Officer, Mr. Ritesh Agarwal, in San Francisco, California.

12.     Defendant's CEO, Mr. Agarwal, used this captive audience opportunity to make affirmative representations about the quality of their business model and specifically about the sophistication and superiority of Defendant's revenue management and guest stay booking software platforms.

13.     At this meeting, Mr. Agarwal knowingly made numerous fraudulent statements in an attempt to induce small or independent property owners (including Dr. Shah) to hand control

over all bookings and revenue management over to Defendant by entering into contracts similar to those signed by Plaintiffs. These representations include, but were not limited to:

    a.  Defendant's sophisticated revenue management and guest stay booking software platforms would increase the property owners' business;

    b.  Defendant's guest stay booking algorithms and revenue modeling tools were state-of-the-art and drew on data and sophisticated modeling from hotel operations around the world and were developed using the best artificial intelligence and/or machine learning talent and resources available anywhere;

    c.  Defendant's software was incomparable and bolstered by Defendant's employment of over two thousand software engineers around the world that continually optimize the revenue management and booking software;

    d.  Defendant's revenue management and booking software mechanisms were so accurate that Defendant could predict, down to the dollar, major revenue growth for each hotel that entered into an agreement with Defendant (which would allow Defendant to offer the guaranteed revenue agreement more fully described below);

    e.  The opportunity to work with Defendant (by converting their properties to OYO-branded hotels) was infallible because even if Defendant's revenue management and booking software did not operate as promised and could not yield the guaranteed revenue, Plaintiffs and all other prospective franchisees could rely on the contractual guaranteed minimum revenue as backstop mechanism.

14.    At the time Mr. Agarwal made the representations outlined above to Dr. Shah and other similarly situated small or independent property owners, Mr. Agarwal knew, or knew to a high degree of certainty, that the representations were false. This is because the OYO pricing and revenue optimization software as well as the OYO Minimum Revenue Guarantee mechanism – the bases for the Mr. Agarwal presenting the opportunity to work with OYO as being infallible – were utterly failing in recent deployments in Japanese, Chinese, European markets, and even in OYO's home market in India; all these issues were ongoing as Mr. Agarwal made his fraudulent statements aimed at small or independent property owners in America (including Dr. Shah) to hand control over all bookings and revenue management over to OYO. *See* Newly Purnell and Phred Dvorak, *Oyo Hotel Chain Suffered Ailments Beyond Pandemic's Travel Slowdown*, WALL STREET JOURNAL (Jan. 21, 2021, 01:21 PM) available at https://www.wsj.com/articles/oyo-hotel-chain-suffered-ailments-beyond-pandemics-travel-slowdown-11609525294 (Attached as Exhibit 5). Specifically, Mr. Agarwal knew "there were pricing issues [with the software] while Oyo was 'learning the ropes of revenue optimization.'" *Id.* Further, Mr. Agarwal had this information from the lawsuits that had been filed against his company in China well prior to any pandemic travel restrictions related to OYO being unable to fulfill the Minimum Revenue Guarantee mechanism. *Id.* (describing, "When Oyo canceled more of its minimum guarantees beginning in late 2019, hotel owners and suppliers filed lawsuits, staged protests at Oyo offices and aired complaints on social media."*).* In fact, by late 2019, OYO was facing numerous lawsuits, dealing with protests at OYO offices, and receiving complaints on social media as a result of its cancelling it's minimum revenue guarantees in these markets. *Id.*

15.    The only explanation for Mr. Agarwal making these statements while knowing them to be false is the statements were made with the intent the small or independent property

owners (including Dr. Shah) would act upon them. Mr. Agarwal was right and, relying on the representations by Mr. Agarwal, many small and independent property owners (including Dr. Shaw) handed over control of all bookings and revenue management to OYO.

16.     Additionally, OYO created a Minimum Revenue Guaranty Mechanism so that anyone who signed such OYO franchise-contracts could expect to achieve a *sum-certain* minimum revenue figure, despite OYO being a lesser known brand, according to the following contractual mechanism: If an OYO-franchised hotel did not achieve an sum-certain Revenue Guarantee, OYO would **pay a portion of the difference between actual revenue and the stated Revenue Guarantee** *on a monthly basis.*

17.     Ostensibly, OYO felt secure enough in its risk calculations to use bold, plain contractual guarantee as follows:

3.     <u>Revenue Guarantee</u>

The Facility Owner and OYO agree to an Annual Revenue Guarantee Amount of US $619,448 (including taxes) for the specified years during the Term.

OYO will pay the owner an amount as per below payout matrix:

| Particulars | Reference |
|---|---|
| Gross Revenues (including all applicable taxes) or OYO Guaranteed Amount, whichever is higher | A |
| Less: 10% of Gross Revenues or OYO Guaranteed Amount, whichever is higher | B |
| Less: 25% of {Gross Revenues Less Oyo Guaranteed Revenue} * | C |
| Payout to owner ** | D = A – B – C |

*\* Only where there is a positive difference between Gross revenue and OYO Guaranteed Revenue*
*\*\* Payout to the owner is further subject to taxes as per section 8 below.*

18.     The Revenue Guarantees, along with the fraudulent statements and representations made by Defendant's CEO described above provided OYO a vast opportunity to rapidly enter the US hospitality market by inducing many small business franchisees, including Plaintiffs, into signing OYO's franchisor/franchisee agreements. *See* Exhibit 1 and Exhibit 2 attached hereto.

19.    Despite its carefully laid plans to enter the U.S. market, it became clear by late 2019 that OYO's business model, its marketing and operational model, as well as its software were not as represented by Defendant's CEO.

20.    This miscalibration multiplied by the rapid expansion into franchised operations in states from Oregon to New Jersey, from Minnesota to Texas resulted in failures to meet its obligations to franchisees including failing to pay out on the Minimum Revenue Guarantees.

21.    Specifically, OYO found that it was forced to offer rooms at up to 75% discounts in order to achieve the online engagement from prospective hotel guests it was targeting. OYO then was faced with the fact that offering these kinds of discounts in the U.S. markets did not drive the kind of volume that would be expected in more price sensitive countries like India. Therefore, OYO was offering steep discounts and triggering the Minimum Revenue Guarantee payment obligations.

22.    Further, the clientele brought by the significantly-discounted room rates was highly detrimental to Plaintiffs' businesses.

23.    In March 2020, a convenient cover for OYO's business failures emerged in the form of the World Health Organization's declaration of Covid-19 as a global pandemic.

24.    Shortly after the WHO's declaration, OYO sent a letter to certain OYO franchisors[1], stating in relevant part as follows:

> As you know, the spread and severity of the Novel Coronavirus (COVID-19) has exponentially increased in the last days and weeks, both in the United States and in other countries around the world.
>
> To combat this pandemic, the state and federal governments have been issuing a variety of directives and orders that have, essentially, precluded

---

[1] Upon information and belief, this letter was sent only to certain smaller franchisees, the exact hotels who were most likely relying on the Minimum Revenue Guarantee.

individuals and corporations from booking hotel rooms. Your hotel is required to comply with these and all other statutes, regulations, and orders of the state.

The consequence of these directives, legal orders and other developments related to the Coronavirus (COVID-19) crisis makes the guest rooms of your OYO hotel "unavailable" within the meaning of Paragraph 3 of your Marketing, Consulting, and Revenue Management Agreement with OYO.

Because the rooms are deemed to be unavailable, the Revenue Guarantee by its terms, among other reasons, will be suspended effective immediately through September 30, 2020, subject to further review ("Suspension Period").

During the Suspension Period, OYO will reduce its base commission rate by 50% and suspend its upside commission rate on any revenues your hotel generates while operating under applicable governmental orders, however should the situation improve during the Suspension Period, OYO reserves the right to amend its discounted base commission rate and/or reinstitute its upside commission rate, in full or part, as per its reasonable estimation.

Exhibit 3.

25.     This unilateral attempt to shift the risks implied in the Minimum Revenue Guarantee was not well received by franchisees who were aware of OYO's attempt to shoehorn a COVID-driven excuse into room "unavailability" within the meaning of the franchisee/franchisor agreement with OYO.

26.     Despite OYO's claims of room "unavailability," Plaintiffs and all other OYO franchisees continued to operate and at no time were all rooms "unavailable." In fact, no rooms in Plaintiffs hotel were "unavailable" based on any "directive, legal order, [or] other development related to the Coronavirus (COVID-19) crisis[.]" In the alternative, the use of the word "unavailable" in the Revenue Guarantees is ambiguous and should be construed against Defendant.

27.    The improperly withheld Revenue Guarantee Payments were as follows for each

Plaintiff (based solely on the dates in the April 2, 2020 letter (i.e., April 2020 through September

2020)):

a.  <u>Chief Hospitality</u>:

    i.  April 2020:      $74,100.00

    ii.  May 2020:      $102,600.00

    iii.  June 2020:      $142,500.00

    iv.  July 2020:      $148,200.00

    v.  August 2020:      $153,900.00

    vi.  <u>September 2020:  $148,200.00</u>

    vii.  **Total:**      **$769,500.00**

b.  <u>Shree Veer</u>:

    i.  April 2020:      $50,003.00

    ii.  May 2020:      $48,190.00

    iii.  June 2020:      $54,461.00

    iv.  July 2020:      $61,774.00

    v.  August 2020:      $55,503.00

    vi.  <u>September 2020:  $59,128.00</u>

    vii.  **Total:**      **$329,059.00**

28.    OYO has quietly and fraudulently sought to force their franchisees to bear the

financial losses and the associated risks that were contractually allocated to OYO in the entirely

foreseeable scenario of reduced travel and tourism.

29.     In this case, therefore, Plaintiffs bring this action on behalf of themselves and a class of similarly situated OYO Franchisees who were induced to enter an OYO franchise contract on the basis of false representations and a Minimum Revenue Guarantee Mechanism and then later defrauded of the Revenue Guarantee payments due to Defendant's unilateral suspension of that contract provision.

## IV.
## CAUSES OF ACTION

### Count A – Breach of Contract

30.     Plaintiffs incorporate by reference and re-allege all allegations of this Petition and would further show that the occurrence made the basis of this lawsuit referred to in this Petition and Plaintiffs' resulting damages were proximately caused by Defendant's breach of contract.

31.     Breach of contract requires:

    i.      There is a valid, enforceable contract;
    ii.     The plaintiff is a proper party to sue for breach of the contract;
    iii.    The plaintiff performed, tendered performance of, or was excused from performing its contractual obligations;
    iv.    The defendant breached the contract; and
    v.     The defendant's breach caused the plaintiff injury.

32.     Defendant has breached its contract with Plaintiffs by, at a minimum, improperly withholding the guaranteed revenue payments required by the contracts between each Plaintiff and Defendant. This improper withholding of the guaranteed revenue payments has resulted in substantial damages to Plaintiffs.

33.     Defendant's breach of contract has proximately caused the occurrence made the basis of this action and Plaintiffs' damages in excess of the minimum jurisdictional limits of the Court.

### Count B – Fraud by Nondisclosure

34.    Plaintiffs incorporate by reference and re-allege all allegations of this Petition and would further show that the occurrence made the basis of this lawsuit referred to in this Petition and Plaintiffs' resulting damages were proximately caused by Defendant's fraud by nondisclosure.

35.    Fraud by nondisclosure requires the following:

    i.    The defendant failed to disclose certain facts to the plaintiff;
    ii.    The defendant had a duty to disclose the facts to the plaintiff;
    iii.    The facts were material;
    iv.    The defendant knew:
        a.    The plaintiff was ignorant of the facts; and
        b.    The plaintiff did not have an equal opportunity to discover the facts;
    v.    The defendant was deliberately silent when it had a duty to speak;
    vi.    By failing to disclose the facts, the defendant intended to induce the plaintiff to take some action or refrain from acting;
    vii.    The plaintiff relied on the defendant's nondisclosure;
    viii.    The plaintiff was injured as a result of acting without the knowledge of undisclosed facts.

36.    Defendant had a duty to disclose the information to Plaintiffs because Defendant partially disclosed the information to Plaintiffs, which created a substantially false impression. Further, Defendant had a duty to disclose the information to Plaintiffs because Defendant voluntarily disclosed some of the information to Plaintiffs. Defendant also owed Plaintiffs a legal duty not to fraudulently procure a contract is separate and independent from the duties established by the contract itself. *Formosa Plastics Corp. United States v. Presidio Eng'rs & Contractors*, 960 S.W.2d 41, 46 (Tex. 1998).

37.    By deliberately remaining silent, Defendant directly and proximately caused the occurrence made the basis of this action and Plaintiffs' damages in excess of the minimum jurisdictional limits of the Court.

38.    These partial disclosures of material facts made by Defendant's CEO to Plaintiffs' principal include, but were not limited to:

a.   Defendant's sophisticated revenue management and guest stay booking software platforms would increase the property owners' business;

b.   Defendant's guest stay booking algorithms and revenue modeling tools were state-of-the-art and drew on data and sophisticated modeling from hotel operations around the world and were developed using the best artificial intelligence and/or machine learning talent and resources available anywhere;

c.   Defendant's software was incomparable and bolstered by Defendant's employment of over two thousand software engineers around the world that continually optimize the revenue management and booking software;

d.   Defendant's revenue management and booking software mechanisms were so accurate that Defendant could predict, down to the dollar, major revenue growth for each hotel that entered into an agreement with Defendant (which would allow Defendant to offer the guaranteed revenue agreement more fully described below);

e.   The opportunity to work with Defendant (by converting their properties to OYO-branded hotels) was infallible because even if Defendant's revenue management and booking software did not operate as promised and could not yield the guaranteed revenue, Plaintiffs and all other prospective franchisees could rely on the contractual guaranteed minimum revenue as backstop mechanism.

39.    The disclosures above were only partial disclosures which created a false impression on the part of Plaintiffs. Specifically, based on representations by Defendant's CEO,

Plaintiffs were led to believe their occupancy and revenues would significantly increase based on the use of Defendant's purportedly world-class revenue management and booking software.

40.     The partial disclosure was required in order to allow Defendant to induce as many small businesses (like Plaintiffs) as possible into signing Defendant's contract as quickly as possible so as to allow Defendant to accomplish its stated goal of rapidly entering into the US hospitality market.

41.     In fact, because the software was not as represented, Defendant could not achieve the promised occupancy rates or revenues for hotel owners like Plaintiff. As a result, Defendant offered rooms at up to 75% discounts in order to achieve the online engagement from prospective hotel guests it was targeting.

42.     The clientele brought by the significantly-discounted room rates was highly detrimental to Plaintiffs' businesses and properties causing Plaintiffs significant damages.

### Count C – Fraud and Fraudulent Inducement

43.     Plaintiffs incorporate by reference and re-allege all allegations of this Petition and would further show that the occurrence made the basis of this lawsuit referred to in this Petition and Plaintiffs' resulting damages were proximately caused by Defendant's fraud and fraudulent inducement.

44.     Common law fraud requires the following:

     i.     Defendant made a representation to plaintiff;
    ii.     The representation was material;
   iii.     The representation was false;
    iv.     When defendant made said representation, defendant:
            a.   Knew the representation was false; or
            b.   Made the representation recklessly, as a positive assertion, and
                 without knowledge of its truth;
     v.     Defendant made the representation with the intent that the Plaintiff act on it;
    vi.     Plaintiff relied on the representation; and
   vii.     The representation caused the plaintiff injury.

45.     Defendant knew the statements were false when made, and intended Plaintiffs to rely upon these representations, on which Plaintiffs did detrimentally rely.  Plaintiffs relied upon the misrepresentations of Defendant to their detriment.  Defendant knew the representations were false or such representations were made recklessly without any knowledge as to the truth and the representations were made knowing Plaintiffs would rely upon them.  As a result of the fraud of Defendant, Plaintiffs suffered damages in excess of the minimum jurisdictional limits of this Court. Defendants' conduct constitutes fraud under common and statutory law.  Accordingly, Plaintiffs also seek exemplary damages sufficient to punish Defendant for said conduct.

46.     Defendant's fraudulent statements and fraudulent inducements include, but are not limited to:

    a.  Representing the opportunity to work with Defendant (by converting their properties to OYO-branded hotels) was infallible because even if Defendant's revenue management and booking software did not operate as promised and could not yield the guaranteed revenue, Plaintiffs and all other prospective franchisees could rely on the contractual guaranteed minimum revenue as backstop mechanism. This assertion was more than an opinion or judgment statement as the same was based on the facts represented by Defendant's CEO that:

        i.  Defendant's sophisticated revenue management and guest stay booking software platforms would increase the property owners' business;

        ii.  Defendant's guest stay booking algorithms and revenue modeling tools were state-of-the-art and drew on data and sophisticated modeling from hotel operations around the world and were developed using the best

artificial intelligence and/or machine learning talent and resources available anywhere;

    iii.  Defendant's software was incomparable and bolstered by Defendant's employment of over two thousand software engineers around the world that continually optimize the revenue management and booking software;

    iv.  Defendant's revenue management and booking software mechanisms were so accurate that Defendant could predict, down to the dollar, major revenue growth for each hotel that entered into an agreement with Defendant (which would allow Defendant to offer the guaranteed revenue agreement more fully described below).

b.  Representing Plaintiffs' available rooms to be "unavailable" because of the COVID-19 pandemic in the April 2, 2020 letter sent to Plaintiffs. This false representation:

    i.  was made knowingly as the rooms were not unavailable and Plaintiffs continued operations throughout the pandemic;

    ii.  allowed Defendant to avoid substantial obligations to Plaintiffs in the form of the guaranteed minimum revenue payments.

## V.
## DAMAGES

47.    Plaintiffs incorporates by reference and re-alleges all allegations of this Petition and would further show that Plaintiff seeks any and all damages whatsoever and including, but not limited to, actual, punitive, exemplary, and statutory damages available and recoverable under

statute and common law resulting from the actions of Defendant supporting Plaintiff's damages. Plaintiffs seek monetary relief in excess of one million dollars ($1,000,000.00).

## VI.
## PREJUDGMENT/POST-JUDGMENT INTEREST

48.     Plaintiffs incorporate by reference and re-allege all preceding sections of this Petition and would further show that many of their damages may be determined by known standards of value and accepted rules of interest as damages during the period beginning on the 180th day after the date Defendant received notice of the claim or on the day suit was filed, whichever occurred first, and ending on the day preceding the date judgment is rendered, or as the Court otherwise directs, calculated at the legal rate, or as otherwise set by the Texas Finance Code, any statute, or the common law.

## VII.
## NOTICE/CONDITIONS PRECEDENT

49.     All conditions precedent necessary to maintain this action have been performed or have occurred.  Alternatively, Defendant has wholly waived and is estopped from asserting all rights to any condition(s) precedent.

## VIII.
## ALTERNATIVE PLEADING

50.     All pleadings herein, if inconsistent, are made pursuant to Rule 48 of the Texas Rules of Civil Procedure.

## IX.
## NOTICE OF INTENT

51.     Plaintiffs hereby give notice of intent to utilize items produced in discovery in the trial of this matter and the authenticity of such items is self-proven per Rule 193.7 of the Texas Rules of Civil Procedure.

## X.
## JURY DEMAND

52.     Plaintiffs demand a jury pursuant to Rule 216 of the Texas Rules of Civil Procedure

and have tendered the jury fee to the Dallas County Clerk's office.

## XI.
## PLAINTIFF'S ORIGINAL CLASS ACTION

53.     Comes  now  Plaintiffs  and  file  their  Original  Class  Action,  as  the  Class

Representatives, complaining of Defendant OYO, and for cause of action would respectfully show

unto the Court the following:

## XII.
## THE PARTIES

54.     Plaintiffs are franchisees of OYO.  Plaintiffs are members of the Class defined

herein and seek to be certified as class representatives of this class.

55.     Defendant OYO (or "Class Defendant") is a foreign corporation with its principal

office in Dallas, Texas that is engaged in the hotel business in the State of Texas and throughout

the world.

## XIII.
## STATEMENT OF CLASS FACTS

56.     This action seeks to recover damages suffered by Plaintiffs and the members of the

class, as a result of Class Defendant's breach of contract, fraud by nondisclosure, fraud and

fraudulent inducement. Plaintiffs and putative class members are all franchisee-hotel-operators of

Class Defendant OYO.

57.     At all times pertinent herein, Plaintiffs have been in a hotel franchisor/franchisee

agreement with Class Defendant. Class Defendant is in similar agreements with other franchisees

like Plaintiff across the United States.

58.     All Class Plaintiffs were the victims of OYO's unilateral attempt to shift the risks created in the Minimum Revenue Guarantee from OYO to its franchisees by way of OYO's attempt to shoehorn a covid-driven excuse into room "unavailability" within the meaning of the franchisee/franchisor agreements with OYO.

59.     Despite OYO's claims of room "unavailability," Plaintiff and other franchisees across the country continued to operate.

60.     OYO has quietly and fraudulently sought to force their franchisees to bear the financial losses and the associated risks that were contractually allocated to OYO in the entirely foreseeable scenario of reduced travel and tourism.

## XIV.
## PUTATIVE CLASS MEMBERS

61.     At all times pertinent herein, all members of the putative class also had in full force and effect identical or near identical contracts with Class Defendant.

62.     On or about June/July 2019, OYO representatives invited Plaintiffs' Managing Member, Dr. Chandrakant Shah, and many other potential Class Plaintiffs to a meeting with Defendant's CEO, Mr. Ritesh Agarwal, in San Francisco, California.

63.     Defendant's CEO used this captive audience opportunity to make affirmative representations about the quality of their business model and specifically about the sophistication and superiority of Defendant's revenue management and guest stay booking software platforms.

64.     At this meeting, Mr. Agarwal knowingly made numerous fraudulently statements in an attempt to induce small or independent property owners (including Dr. Chandrakant Shah) to hand control over all bookings and revenue management over to Defendant by entering into contracts similar to those signed by Plaintiffs. These representations include, but were not limited to:

a. Defendant's sophisticated revenue management and guest stay booking software platforms would increase the property owners' business;

b. Defendant's guest stay booking algorithms and revenue modeling tools were state-of-the-art and drew on data and sophisticated modeling from hotel operations around the world and were developed using the best artificial intelligence and/or machine learning talent and resources available anywhere;

c. Defendant's software was incomparable and bolstered by Defendant's employment of over two thousand software engineers around the world that continually optimize the revenue management and booking software;

d. Defendant's revenue management and booking software mechanisms were so accurate that Defendant could predict, down to the dollar, major revenue growth for each hotel that entered into an agreement with Defendant (which would allow Defendant to offer the guaranteed revenue agreement more fully described below);

e. The opportunity to work with Defendant (by converting their properties to OYO-branded hotels) was infallible because even if Defendant's revenue management and booking software did not operate as promised and could not yield the guaranteed revenue, Plaintiffs and all other prospective franchisees could rely on the contractual guaranteed minimum revenue as backstop mechanism.

65.    At the time Mr. Agarwal made the representations outlined above to the potential Class Plaintiffs, Mr. Agarwal knew, or knew to a high degree of certainty, that the representations were false. This is because the OYO pricing and revenue optimization software as well as the OYO

Minimum Revenue Guarantee mechanism – the bases for the Mr. Agarwal presenting the opportunity to work with OYO as being infallible – were utterly failing in recent deployments in Japanese, Chinese, European markets, and even in OYO's home market in India; all these issues were ongoing as Mr. Agarwal made his fraudulent statements aimed at small or independent property owners in America (including Dr. Shah) to hand control over all bookings and revenue management over to OYO. *See* Newly Purnell and Phred Dvorak, *Oyo Hotel Chain Suffered Ailments Beyond Pandemic's Travel Slowdown*, WALL STREET JOURNAL (Jan. 21, 2021, 01:21 PM) available at https://www.wsj.com/articles/oyo-hotel-chain-suffered-ailments-beyond-pandemics-travel-slowdown-11609525294 (Attached as Exhibit 5). Specifically, Mr. Agarwal knew "there were pricing issues [with the software] while Oyo was 'learning the ropes of revenue optimization.'" *Id.* Further, Mr. Agarwal had this information from the lawsuits that had been filed against his company in China well prior to any pandemic travel restrictions related to OYO being unable to fulfill the Minimum Revenue Guarantee mechanism. *Id.* (describing, "When Oyo canceled more of its minimum guarantees beginning in late 2019, hotel owners and suppliers filed lawsuits, staged protests at Oyo offices and aired complaints on social media."*)*. In fact, by late 2019, OYO was facing numerous lawsuits, dealing with protests at OYO offices, and receiving complaints on social media as a result of its cancelling it's minimum revenue guarantees in these markets. *Id.*

66.    The only explanation for Mr. Agarwal making these statements while knowing them to be false is the statements were made with the intent the small or independent property owners (including Dr. Shah) would act upon them. Mr. Agarwal was right and, relying on the representations by Mr. Agarwal, many small and independent property owners (including Dr. Shaw) handed over control of all bookings and revenue management to OYO.

67.     Defendant's CEO further shocked the audience by representing that Defendant would provide a contractual guaranty mechanism of a sum certain for revenue.

68.     Plaintiffs and many other potential Class Plaintiffs signed franchisor/franchisee agreements with OYO as a result of these fraudulent representations. Each such agreement contained the Revenue Guarantees.

69.     Each Class Plaintiff then received the fraudulent covid-driven excuse of room "unavailability" by OYO to avoid its obligations under the Revenue Guaranty despite being open for business.

## XV.
## CLASS ACTION ALLEGATIONS

70.     This action is brought under Rule 42 of the Texas Rules of Civil Procedure. Class Representative Plaintiffs believe Class Defendant's conduct has been systematic and continuous and has affected many of Class Defendant's franchisees.

71.     Class Representative Plaintiffs bring this Texas Class Action to secure redress for:

    a.  Class Defendant fraudulently inducing Class Plaintiffs into entering into the franchisee agreements with the Revenue Guarantee; and

    b.  Class Defendant fraudulently avoiding its obligations owed franchisees pursuant to the Revenue Guarantees.

72.     Class Defendant's obligations and conduct has been uniform throughout the Class Period. Class Representative Plaintiffs bring this action individually and on behalf of all entities similarly situated and seek certification of the following Class:

    a.  All entities operating guest-stay properties in the United States or its territories who:

        i.  signed a franchise agreement with OYO hotels that included a

Revenue Guarantee provision;

ii.   received a covid-related Notice of Revenue Guarantee suspension; and

iii.  who did not receive Revenue Guarantee Payments from OYO at any point from March 2020 until the date that notice of this class action is disseminated to the Class.

### *Common Issues Predominate*

73.   There is a well-defined community of interest in the questions of law and fact among the representative Plaintiffs and the Class Plaintiffs in that Class Defendant has acted in a manner generally applicable to the entire class.

74.   The predominant and common questions of law and fact as to each of the class members and the Plaintiffs include, but are not limited to:

a.   Is Class Defendant fraudulently inducing Class Plaintiffs into revenue-guaranteed franchisor/franchisee agreements?

b.   Is Class Defendant arbitrarily, unilaterally and fraudulently withholding Guaranteed Revenue payments?

### *Numerosity*

75.   Membership in the class is so numerous that it is impractical to bring all class members before the Court.  The exact number of class members is unknown, but can be determined from the records maintained by Class Defendant and is estimated to be at least 50-70.

### *Typicality*

76.   The claims of Plaintiffs are typical of the claims of the class.  Plaintiffs' claims are based on the same common facts, including the same contract with Class Defendant, applicable to all its franchisees, and the same legal theories.  The common questions of law and fact alleged above are

shared by the Plaintiffs and Class Plaintiffs, and the determination of said common questions is largely dispositive of the case other than mathematical and formulaic calculations based on Class Defendant's own adjustments.

### *Adequacy of Representation*

77.    Plaintiffs will fairly and adequately protect the interests of the Class Plaintiffs and have retained counsel experienced and competent in the handling of class actions, multiparty litigation, and/or complex litigation.  Plaintiffs have no interests which are contrary to or in conflict with those of Class Plaintiffs.

### *Ascertainability*

78.    The number and identity of the members of the Class are readily determinable from the records of Class Defendant.  Class Plaintiffs may be notified of the pendency of this class action by mail.  Their addresses are readily available through Class Defendant's records.

### *Risk of Inconsistent Adjudications*

79.    The prosecution of separate actions by Class Plaintiffs would create a risk of inconsistent and varying adjudications concerning the subject of this action which could establish incompatible standards of conduct for Class Defendant.

### *Manageability*

80.    This action will cause an orderly and expeditious administration of class claims, economies of time, effort and expense will be fostered, and uniformity of decisions will be ensured. This action should present no difficulty which would impede its management by the court as a class action and is the best available means by which Plaintiffs and Class Plaintiffs can seek redress for the harm caused to them by Class Defendant.

### *Superiority*

81.     The determination by the Court of the above common questions as to the entire class and the fact that there would remain only mathematical and formulaic calculations as to individual class members makes the handling of the case as a class action vastly superior to the prospect of fifty or more separate cases seeking the same relief.

82.     On the other hand, denial of class treatment would certainly result in numerous franchisees of Class Defendant not pursuing their rightful claims by individual actions due to lack of financial ability to hire counsel, relative size of their claim, or ignorance of their claim.   Class treatment of these claims is superior, procedurally and legally, to the alternatives of a multitude of individual clients' claims along with a massive number of unpursued, but meritorious, claims which would simply reward the Defendant for its improper conduct toward its franchisees.

**XVI.**
**CLASS COUNT A: BREACH OF CONTRACT**

83.     Class Representative Plaintiffs re-allege on behalf of Class Plaintiffs the allegations contained in the previous paragraphs as if set forth fully herein.

84.     Plaintiffs and the members of the Class entered into contracts with Class Defendant whereby Class Defendant was to provide Guaranteed Revenue payments to Class Plaintiffs.

85.     Plaintiffs and members of the Class have complied with all conditions precedent required to be entitled to relief under said contract.

86.     Class Defendant breached the provisions of its contracts with Plaintiffs and Class Plaintiffs by:

        a.   Arbitrarily, unilaterally and fraudulently withholding Guaranteed Revenue payments.

87.     As a direct and foreseeable consequence of the foregoing, Plaintiffs and the members of the Class have been damaged in an amount within the jurisdictional limits of the Court.

## XVII.
## CLASS COUNT B: FRAUD BY NONDISCLOSURE

88.     Class Representative Plaintiffs re-allege on behalf of Class Plaintiffs the allegations contained in the previous paragraphs as if set forth fully herein.

89.     Plaintiffs and the members of the Class entered into contracts with Class Defendant whereby Class Defendant was to provide Guaranteed Revenue payments to Class Plaintiffs.

90.     Plaintiffs and members of the Class have complied with all conditions precedent required to be entitled to relief under said contract.

91.     Class Defendant had a duty to disclose information to Plaintiffs and members of the Class because Class Defendant partially disclosed information, which created a substantially false impression.  Class Defendant provided to Plaintiffs and members of the Class information regarding the Guaranteed Revenue program, which created a substantially false impression on the part of Plaintiff and members of the Class.

92.     As a direct and foreseeable consequence of the foregoing, Plaintiffs and the members of the Class have been damaged in an amount within the jurisdictional limits of the Court.

93.     These partial disclosures made by Defendant's CEO to Plaintiffs' principal include, but were not limited to:

   a.   Defendant's sophisticated revenue management and guest stay booking software platforms would increase the property owners' business;

   b.   Defendant's guest stay booking algorithms and revenue modeling tools were state-of-the-art and drew on data and sophisticated modeling from hotel operations around the world and were developed using the best artificial intelligence and/or machine learning talent and resources available anywhere;

c. Defendant's software was incomparable and bolstered by Defendant's employment of over two thousand software engineers around the world that continually optimize the revenue management and booking software;

d. Defendant's revenue management and booking software mechanisms were so accurate that Defendant could predict, down to the dollar, major revenue growth for each hotel that entered into an agreement with Defendant (which would allow Defendant to offer the guaranteed revenue agreement more fully described below);

e. The opportunity work with Defendant (by converting their properties to OYO-branded hotels) was infallible because even if Defendant's revenue management and booking software did not operate as promised and could not yield the guaranteed revenue, Plaintiffs and all other prospective franchisees could rely on the contractual guaranteed minimum revenue as backstop mechanism.

94.     The disclosures above were only partial disclosures which created a false impression on the part of Plaintiffs. Specifically, based on representations by Defendant's CEO, Plaintiffs were led to believe their occupancy and revenues would significantly increase based on the use of Defendant's purportedly world-class revenue management and booking software.

95.     The partial disclosure was required in order to allow Defendant to induce as many small businesses (like Plaintiffs) as possible into signing Defendant's contract as quickly as possible so as to allow Defendant to accomplish its stated goal of rapidly entering into the US hospitality market.

96.     In fact, because the software was not as represented, Defendant could not achieve the promised occupancy rates or revenues for hotel owners like Plaintiff. As a result, Defendant offered rooms at up to 75% discounts in order to achieve the online engagement from prospective hotel guests it was targeting.

97.     The clientele brought by the significantly-discounted room rates was highly detrimental to Plaintiffs' businesses and properties causing Plaintiffs significant damages.

## XVIII.
## CLASS COUNT C: FRAUD/FRAUDULENT INDUCEMENT

98.     Class Representative Plaintiffs re-allege on behalf of Class Plaintiffs the allegations contained in the previous paragraphs as if set forth fully herein.

99.     Plaintiffs and the members of the Class entered into contracts with Class Defendant whereby Class Defendant was to provide Guaranteed Revenue payments to Class Plaintiffs.

100.    Plaintiffs and members of the Class have complied with all conditions precedent required to be entitled to relief under said contract.

101.    Class Defendant has made misrepresentations of material facts to the Plaintiffs and members of the Class regarding the Guaranteed Revenue program provided by Class Defendant. Class Defendant knew the statements were false when made, and intended Plaintiffs and members of the Class to rely upon these representations and/or failures to disclose, on which Plaintiffs and members of the Class did detrimentally rely. The misrepresentations included, but are not limited to:

   a.   The infallible nature of the Guaranteed Revenue program; and

   b.   Arbitrarily, unilaterally and fraudulently withholding Guaranteed Revenue payments based on room "unavailability."

102.    The false representations and concealment of the true facts regarding the Guaranteed Revenue payments were done in order to induce potential customers, including Plaintiffs and

members of the Class, into signing franchisor/franchisee agreements with Defendant. Had Plaintiffs and members of the Class known the true nature of Class Defendant's program, including Class Defendant's ability to unilaterally and arbitrarily withhold Guaranteed Revenue payments, Plaintiffs and members of the Class would not have contracted with Defendant.

103.    Defendant's fraudulent statements and fraudulent inducements include, but are not limited to:

    a.    Representing the opportunity to work with Defendant (by converting their properties to OYO-branded hotels) was infallible because even if Defendant's revenue management and booking software did not operate as promised and could not yield the guaranteed revenue, Plaintiffs and all other prospective franchisees could rely on the contractual guaranteed minimum revenue as backstop mechanism. This assertion was more than an opinion or judgment statement as the same was based on the facts represented by Defendant's CEO that:

        i.    Defendant's sophisticated revenue management and guest stay booking software platforms would increase the property owners' business;

        ii.    Defendant's guest stay booking algorithms and revenue modeling tools were state-of-the-art and drew on data and sophisticated modeling from hotel operations around the world and were developed using the best artificial intelligence and/or machine learning talent and resources available anywhere;

        iii.    Defendant's software was incomparable and bolstered by Defendant's employment of over two thousand software engineers around the world

that continually optimize the revenue management and booking software;

iv. Defendant's revenue management and booking software mechanisms were so accurate that Defendant could predict, down to the dollar, major revenue growth for each hotel that entered into an agreement with Defendant (which would allow Defendant to offer the guaranteed revenue agreement more fully described below).

b. Representing Plaintiffs' available rooms to be "unavailable" because of the COVID-19 pandemic in the April 2, 2020 letter sent to Plaintiffs. This false representation:

i. was made knowingly as the rooms were not unavailable and Plaintiffs continued operations throughout the pandemic;

ii. allowed Defendant to avoid substantial obligations to Plaintiffs in the form of the guaranteed minimum revenue payments.

104. As a direct and foreseeable consequence of the foregoing, Plaintiffs and members of the Class have been damaged in an amount within the jurisdictional limits of the Court.

## XIX.
## DEMAND FOR JURY TRIAL

105. Plaintiffs and members of the Class continue to demand a jury trial and have submitted the requisite fee for the same.

## XX.
## PRAYER

106.    Plaintiffs and members of the Class have incurred economic damages as a result of Class Defendant's conduct as described above.  As a result, Plaintiffs and the members of the Class are entitled to and pray for the following damages:

a.    Certification of this case as a class action;

b.    Judgment against Class Defendant for actual damages;

c.    Judgment against Class Defendant for any other damages allowed by law, including, but not limited to, exemplary, punitive, statutory, and treble damages;

d.    A reasonable sum for Attorneys' fees with conditional sums for the services of Plaintiff's and the Class' attorney in the event of subsequent appeals;

e.    Pre-judgment interest;

f.    Post-judgment interest;

g.    Costs of court;

h.    Litigation expenses, including expert fees, costs for copies of depositions, copy costs, costs of court, etc.; and

i.    Such other and further relief to which Plaintiffs and the members of the Class may be entitled at law or in equity, whether pled or unpled.

WHEREFORE, PREMISES CONSIDERED, Plaintiff respectfully request that the Court certify this case as a Class Action, that Plaintiffs' counsel be appointed as Class Counsel, and that judgment be entered for Plaintiffs and the Class against Defendant for damages as described above and for such other and further relief whether at law or in equity, to which they and the Class may show themselves justly entitled.

Respectfully submitted,

*/s/ Van Shaw*

EVAN LANE (VAN) SHAW
State Bar No. 18140500
JEREMY B. (BEAU) POWELL
State Bar No. 24099163
DAVID J. WELCH
State Bar No. 24098593
LAW OFFICES OF VAN SHAW
2723 Fairmount
Dallas, Texas 75201
(214) 754-7110
FAX NO. (214) 754-7115
van@shawlaw.net
beau@shawlaw.net
david@shawlaw.net


-and-

Shawn Lowe Desai
MI Bar No. P81845
DESAI LEGAL SERVICES
6450 Farmington Road
West Bloomfield, MI 48322
(810) 355-6134
FAX NO. (833) 465-1098
shawn@desailegalservices.com

ATTORNEYS FOR PLAINTIFFS


## CERTIFICATE OF SERVICE


The undersigned certifies that a copy of the foregoing instrument was served upon the attorneys of record of all parties to the above cause in accordance with the Rules of Civil Procedure, on this 6th day of October 2021.


*/s/ Beau Powell*
Jeremy B. (Beau) Powell